## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ADAM SILVA, et al.,

     Plaintiffs,

vs.            Case No. 08-1143-JTM

ST. ANNE CATHOLIC SCHOOL,
Wichita, Kansas, et al.,

     Defendants.

### MEMORANDUM AND ORDER

 Defendants' motion for summary judgment (Dkt. No. 31) is before the court.   Plaintiffs

allege: (1) intentional discrimination under 42 U.S.C. § 1981 (§ 1981) and Title VI of the Civil

Rights Act of 1964, 42 U.S.C. § 2000d, et seq., (1994) (Title VI); (2) hostile environment under

§ 1981  and Title VI; and (3) retaliation under § 1981  and Title VI.  The court held a hearing on

the matter on August 8, 2008, and informed the parties via email prior to the start of trial that it

granted in part and denied in part the motion.  This order serves to memorialize and expand on

the findings of the court that have previously been communicated to the parties.

### I.  Background

 For purposes of defendants' motion for summary judgment, the following facts are

uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to

plaintiff.

Three sixth-grade Catholic School students and their parents (plaintiffs) allege discrimination based on race, color, or national origin because of an English-only rule, which St. Anne Catholic School (St. Anne's) formally implemented near the beginning of the 2007-2008 school year.  Plaintiffs claim that St. Anne's violated Title VI and § 1981 by intentionally discriminating against sixth-graders based on race, color, or national origin causing a hostile educational environment.  Defendants deny the allegations, asserting that the English only rule is not discriminatory, did not cause a hostile educational environment, and was implemented as a legitimate and appropriate response to inappropriate behavior by a few students.

St. Anne's receives federal funds through the National School Lunch Program (NSLP) administered by the United States Department of Agriculture (USDA).  Under the program, the government gave St. Anne's $2.47 in cash for every free lunch, $2.07 for every reduced price lunch, and $0.23 for every paid lunch the school served during the 2007-2008 school year.

The three minor student plaintiffs, Adam Silva, Dalia Fernandez, and Cesar Cruz, speak English and Spanish; English is their primary or "first" language.  St. Anne's is a private Catholic elementary and middle school in Wichita, Kansas, operated by the Catholic Diocese of Wichita.  The admission and continued enrollment of a student at St. Anne's is voluntary; the school and the diocese reserve the right to admit or deny admission or continued enrollment to any student at any time.  The principal or pastor of St. Anne's is the final authority on all matters related to discipline.  The school handbook provides, in part:

> The principal (and/or) pastor is the final recourse in all disciplinary situations and may waive any and all regulations for just cause at his or her discretion.  When rules aren't followed consequences will be given depending upon the nature of the offense.

2

All plaintiff families acknowledged that statement and agreed to be governed by the handbook when they enrolled their children at the school.

Catholic schools are stricter than public schools and have different rules.  Parents often choose to send their children to private schools because such schools are allowed to discipline children more, and to maintain a rather strict environment.

All classes and school functions at St. Anne's, with the exception of foreign language classes, are conducted in English.  Before the 2007-2008 school year, St. Anne's did not have a written English-only rule, although there were various occasions when St. Anne's asked individual students to speak English at school.  At the outset of the 2007-2008 school year, defendants claim that faculty and staff at St. Anne's were experiencing challenges with their middle school students, particularly with discipline and focus.  Defendants claim that teachers were getting reports that a group of middle school students was speaking Spanish in the lunchroom and on the playground, and that other students started complaining about not understanding what was being said.

Sister Margaret, the principal at St. Anne's, sent out a letter to parents on September 17, 2007, which stated, in part:

> We are experiencing some challenges in behavior that are inappropriate for St. Anne School. Some of these include: name calling, not including others, put-downs, and in general—**Bullying**! Sometimes it appears to me that some students feel that they don't have to abide by our policies. **This will not be tolerated.** This causes disruption in teaching and learning. If this continues, individual parents/students will be obliged to attend a conference!
>
> Are you as parents being good examples and getting your family to church on the weekend? Or do you allow some other events to take its place? I hope not!

> I've been thinking about writing this letter for a couple of weeks. We want to get on the right track immediately, so academic growth can be realized. **We appreciate the many parents who are supporting us in all our endeavors and monitoring their students' progress and conduct.**
>
> **We require English be spoken during school at all times!** We are requesting that no native language other than English be spoken. Since all subjects are taught in English then they need strengthening in that area. The more students are immersed in English language the better the chance for improvement/success.

(Dkt. No. 32, p. 9, Ex. M; Dkt. No. 42, p. 15 Ex. 1)(emphasis in original).

Defendants claim that the English-only rule was enacted to combat bullying, name-calling, and put-downs, while plaintiffs argue that defendants' justifications for the rule are not true. Before and after the September 17 letter, plaintiffs were told by various faculty and staff members at St. Anne's not to speak Spanish. Further, plaintiffs were frequently told the reason for the rule and appeared to understand it.

A parent meeting was held on September 20, 2007, to address the English-only rule. The meeting was to inform the parents of the rationale for that rule, and to discuss the issues surrounding the implementation of the rule. Sister Margaret explained the intent of the September 17 letter and the importance of being able to understand what was being said by the students. Sister Margaret also clarified that the rule applied only to communications among the students, and that the students could use Spanish with any bilingual adult on campus. Plaintiffs claim that Sister Margaret also stated that the reason for the English-only rule was to prevent cliques.

On September 27, 2007, plaintiffs Mike Silva, Clara Silva, and Adam Silva met with Sister Margaret, Father Nolan and Roxanne Goehring to discuss issues related to the Silvas'

strong opposition to the English-only policy and Adam's behavior.  Defendants claim that Clara

Silva was disrespectful and demeaning to Sister Margaret in front of Adam at the meeting, which

is a violation of the school handbook.  Plaintiffs, however, claim that she merely told Sister

Margaret not to embarrass Adam anymore in front of his classmates, a request seemingly in

reference to some prior disciplinary action.

On October 2, 2007, the Silvas and other parents met with the Diocese Superintendent of

Schools, Bob Voboril, to discuss the English-only rule, as well as concerns that the controversy

was causing a potential division in the Parish community.  Shortly after that meeting, Diocese

officials met with Bishop Jackels, the ecclesiastic head of the Catholic Diocese of Wichita.  The

group affirmed the English-only requirement, which Mr. Voboril followed up with a letter to all

parents and teachers at St. Anne's, stating in part:

> Ordinarily, children may use whatever language they want when they are on the playground or in the lunchroom, but when the principal and teachers feel that it is necessary to maintain good order and safety, it is their responsibility, and theirs alone, to direct that the children use English.
>
> Sister Margaret is the principal of St. Anne Catholic School and is in charge of the school. It is clear to me and to Bishop Jackels that there have been instances of bad behavior that must be corrected now, for the good of the children and of the entire school, and Sister and her teachers have my full support to do so.  I am convinced that these problems are normal ones of young adolescents misbehaving, as children of any ethnic background will sometimes do. **However, if there are students or families who refuse to obey Sister or the teachers, they will be asked to leave St. Anne's**, as would any other parent or student who refuses to obey the school rules.

(Dkt. No. 32, p. 13, Ex. O) (emphasis in original).

On October 9, 2007, following the Diocese's decision supporting the English-only rule, Sister Margaret asked the entire sixth-grade class to sign an acknowledgment related to appropriate school behavior and the English-only rule.  The document stated:

> The faculty and staff have discussed Lunch room procedures along with playground, locker rooms, restrooms, and passing times.
>
> We have decided that you may sit where you want in the lunchroom as long as your behavior is not a problem. (Respect, courtesy, etc.)
>
> If your behavior is below the line, you may be asked to move to another table. Should we have a problem with the playground, restrooms, locker rooms, etc., you may be dismissed later and not be with your class.
>
> A letter will be coming from Bishop Jackels and Mr. Voboril stating that English is the language to be spoken during the school day.
>
> If this doesn't take place, consequences will follow. Thanks.

(Dkt. No. 32, p. 14, Ex. P].  Plaintiff Adam Silva refused to sign the document.  No one informed Adam or his parents that his refusal could lead to his expulsion from school.

Defendants contend that Adam left St. Anne's on October 12, 2007, after a meeting with Sister Margaret in which she requested that Adam's parents transfer him to St. Elizabeth Ann Seton Catholic School (SEAS).  The Silvas deny that Adam was transferred, and instead contend that he was thrown out of the school.  Although the issue of whether the Silva family wanted to transfer Adam to SEAS is disputed, it is undisputed that the principal of SEAS contacted Sister Margaret, at which time Sister Margaret recommended that Adam be accepted as a transfer student in good standing.  This is significant because students expelled from one Diocesan school are not normally permitted to enroll in another Diocesan school.

The Silvas claim that Adam's ejection was based solely on his refusal to sign the acknowledgment of the English-only rule.  Defendants assert that the Silvas were asked to transfer their son to another school primarily because of parental defiance of the principal's authority.

Plaintiffs also claim that the English-only policy caused other students to taunt the minor plaintiffs.  Plaintiffs identify two incidents where another middle school student made a statement or did something they considered inappropriate.  One related to an email reflecting hostility toward the Hispanic community by referencing the United States as "our country, not yours."  Sister Margaret met with the student and the student's mother to discuss the offensive nature of the email.  The student who sent the email was counseled on the inappropriate nature of the email, and was told not to do anything like that again.

The other incident involved a student telling Dalia Fernandez not to touch or fold an American flag after Dalia Fernandez folded a flag and mistakenly forgot to put the stars on the outside.  A student told Dalia Fernandez that she had done it wrong and that "we weren't in Mexico."  The teacher talked to the student about the comment, corrected the student for his inappropriate comment, and handled the event as a teaching opportunity.  Dalia Fernandez reported that she felt that it was appropriate for her teacher to talk to the boy who had made the comment.

Plaintiffs also claim that they were targeted and watched by the staff at St. Anne's while in the lunchroom and on the playground.  Defendants admit implementing an assigned seating plan, which required the entire sixth grade class to sit at assigned seats during lunch.  The seating chart was put in place to encourage the students to interact more, as all students were mixed from

7

their normal seating choices.   Plaintiffs claim that the Hispanic children were specifically targeted and not allowed to sit together, even after the assigned seating mandate was lifted. Further, plaintiffs claim that defendants spent an inordinate amount of time watching the sixth grade Hispanic children.  Defendants, however, claim the faculty and staff monitor all the children's behavior constantly.

## II.  Legal Standard

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."  *Id.*  In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the nonmoving party.  *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to summary judgment.  *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate* Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in *Matsushita*).  The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting FED. R. CIV. P. 1).

## III.  Analysis

Plaintiffs allege: (1) intentional discrimination under § 1981 and Title VI; (2) hostile environment claim under § 1981 and Title VI; (3) retaliation under § 1981 and Title VI.  Plaintiffs seek injunctive relief, as well as compensatory and punitive damages.

Defendants argue that summary judgment is proper for several reasons.  First, it argues that the court lacks subject matter jurisdiction over plaintiffs' claims against any defendant except the diocese.  Further, defendants argue that the English-only rule is not discriminatory and did not cause a hostile educational environment.  Specifically, defendants argue that summary judgment is proper because plaintiffs cannot establish a prima facie case on any of their claims,

and further cannot establish that defendants' proffered reason for the English-only rule was pretextual.

Plaintiffs neither respond specifically to defendants' arguments, nor address the elements of a prima facie case or to show pretext.  Instead, plaintiffs argue that the blanket English-only policy constitutes a prima face case of discrimination and argue that the rationale propounded by the school for the rule has been rejected in other contexts.

## 1. **Preliminary Matters**

### A. *Subject Matter Jurisdiction*

#### 1. *Properly Named Defendants*

Plaintiffs invoke subject matter jurisdiction under 28 U.S.C. § 1331.  In the pre-trial order, defendants dispute that the court has subject matter jurisdiction over plaintiffs' claims against any of the defendants except the diocese, because the school and the parish are not legal entities, and no claim has been stated against Sister Margaret.  Defendants also claim that the parents as individuals have no claims over which this court could have subject matter jurisdiction.

In response, plaintiffs claim that Fed. R. Civ. P. 17(b)(3)(A), which provides that "a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws. . . ," provides a jurisdictional basis for all defendants.  However, case law dictates that neither St. Anne Catholic School nor St. Anne Catholic parish are separate legal entities from the Catholic Diocese of Wichita, a Kansas Corporation.  As such, the parish and

school are dismissed from the action.  *See, e.g., Fuller v. Woodland Racing*, No. 92-2317, 1994

WL 171408, at *2-3  (D. Kan. Apr. 7, 1994) (dismissing improperly named defendants as non-

entities without capacity to be sued); *Brooks v. Hartford, Inc.*, 715 F. Supp. 1034 (D. Kan. 1989)

(amending complaint where plaintiff had filed suit against a business name that was not a legal

entity).

### 2.  Individual Liability Under Title VI

The law is clear that individuals are not subject to liability under Title VI in their

individual capacities.  *See e.g., Garvey ex rel Doe v. Unified Sch. Dist. 262*, No. 05-1149, 2005

WL 2548332, at *3, FN 4 (D. Kan. Oct. 12, 2005)*; Peters v. Molloy Coll. of Rockville Ctr.*, No.

07-2553, 2008 WL 2704920, at *8 (E.D.N.Y. Jul. 8, 2008); *Folkes v. N.Y. Coll. of Osteopathic*

*Med.*, 214 F. Supp. 2d 273, 292 (E.D.N.Y. 2002).   Nonetheless, the law is not clear as to whether

individuals may be subject to liability under Title VI in their official capacities.  *See, e.g., Kelly*

*v. Rice*, 375 F. Supp. 2d 203, 208 (S.D.N.Y. 2005) (dismissing claim "insofar as it alleges a Title

VI violation by [the defendant] in his individual capacity" only)*.*  As such, summary judgment is

proper to the extent that the Title VI claims are against Sister Margaret in her individual capacity.

Summary judgment is not proper, however, to the extent that the Title VI claims are against

Sister Margaret in her official capacity.

### 3.  Standing

Finally, defendants assert that the non-student plaintiffs (Mike Silva, Clara Silva, Fermin

Fernandez, Maria Fernandez, and Guadalupe Cruz-Tello) lack standing.  "The party seeking to

invoke jurisdiction of the court bears the burden of establishing [it] has met the requirements of

standing." *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997).  To meet this

burden, a plaintiff must prove: (1) that she suffered an 'injury in fact - an invasion of a legally

protected interest that is 'concrete and particular' and not merely hypothetical; (2) that there is a

"causal connection between the injury and the conduct complained of;" and (3) that it is likely

"that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560-61 (1992).

Defendants argue that the non-student plaintiffs lack standing to sue because the intended

beneficiaries of the federally funded school program are the school children, not their parents.

*Jackson v. Katy Ind. Sch. Dist.*, 951 F. Supp. 1293, 1298 (S.D. Tex. 1996).  Further, the English-

only rule applied only to the students, not the parents.  Because of that, the non-student plaintiffs

have not suffered an injury in fact, and their individual claims are dismissed.  Nonetheless, to the

extent that the non-student plaintiffs are bringing this suit on behalf of their children, their claim

still stands.

### B.  Applicability of § 1981

Plaintiffs assert § 1981 gives rise to a cause of action in these circumstances.   Section

1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in
> every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to full and equal benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens, and shall be subject to like
> punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no
> other.

42 U.S.C. § 1981(a).  Plaintiffs argue that § 1981 applies to private schools because the

relationship between a school and a student is contractual.  Relying on *Runyon v. McCrary*, 427

U.S. 160 (1976), plaintiffs argue that even private schools are subject to § 1981.  In *Runyon*, the

United States Supreme Court held that § 1981 prohibited private schools from excluding children who are qualified for admission solely on the basis of race because § 1981 "prohibits racial discrimination in the making and enforcement of private contracts."  427 U.S. at 168.

Plaintiffs further argue that § 1981 forbids discrimination in post-formation conduct, such as harassment of a student by an administrator:

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(b).  Accordingly, plaintiffs argue that § 1981 prohibition against discrimination applies to private schools, such as the defendants.  Nonetheless, defendants argue that plaintiffs fail to identify racial discrimination in the making and enforcement of any contract, an obvious prerequisite to a claim under § 1981.  Defendants argue that there are no claims of breach of contract or implied contract in the Second Amended Complaint.

Plaintiffs' reliance on *Runyon* is misplaced; it is undisputed that both private and public schools may not refuse to enroll any students because of race or color.  *Runyon*, 427 U.S. at 160. Here, however, admittance of students into St. Anne's is not in issue, and plaintiffs fail to implicate the enforcement of any contract which might be applicable.

Nonetheless, plaintiffs argue that while all students were admitted without violation of § 1981, the English-only policy and Adam Silva's subsequent transfer were forbidden post-formation contract violations.  The United States Supreme Court has stated:

> We have never retreated from what should be obvious from reading the text of the statute: Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing

13

contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.

*Domino's Pizza, Inc. V. McDonald*, 546 U.S. 470, 476 (2006).  As such, this court recognizes that § 1981 is applicable to private schools in many instances.  In this case, the school handbook's statements regarding race and diversity give rise to enough of a contractual relationship to allow the case to proceed under § 1981.  Accordingly, for purposes of summary judgment, plaintiffs have sustained their burden of proof that an existing contractual relationship may have been impaired to give rise to a claim under § 1981.

### C.  Applicability of Title VI

Plaintiffs next argue that Title VI applies to all schools that receive any amount of federal funds.  Title VI provides:

> No person in the United States shall, on ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000(d).  Both parties agree that some students at St. Anne's receive federal financial assistance under the NSLP, and thus Title VI's prohibition against discrimination clearly applies.  However, the parties disagree as to Title VI's reach.  Defendants argue that Title VI prohibits discrimination only in the specific program or activity receiving federal financial assistance, which would thus prohibit St. Anne's from discriminating only in its administration of NSLP.  Defendants argue that because St. Anne's did not discriminate in its administration of the NSLP, and because the NSLP is program specific, it is not subject to Title VI.  In support of their position, defendants rely upon *Cureton v. NCAA*, which held that certain regulations under Title VI applied only to individual programs and activities.  198 F.3d 107, 115 (3d Cir. 1999).

14

Plaintiffs, on the other hand, argue that the Civil Rights Restoration Act broadened the scope of Title VI to apply to all of the operations of the entity receiving federal financial assistance.  The Civil Rights Restoration Act provides, in part that: "For the purposes of this subchapter, the term 'program or activity' and the term 'program' mean all of the operations of - (3)(A) an entire . . .  private organization (I) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole. . . ."  42 U.S.C. § 2000d-4a(3)(I).  Plaintiffs further argue that defendants have misread *Cureton*, because the court in *Cureton* did not analyze the scope of Title VI.

In *Cureton*, plaintiffs brought a claim for disparate impact against the NCAA, and the Third Circuit held that the regulations upon which the plaintiffs based their cause of action were program specific.  198 F.3d 115.  As such, only programs directly receiving federal funding could be held liable for disparate impact under Title VI.  *Id.*  However, the program-specific language applied to the claim for disparate impact.  In contrast, where a claim is brought for intentional discrimination, as it is here, an organization can be considered a recipient of federal funds for the purposes of Title VI on an institution wide basis.  *Id.*

The United States Supreme Court has addressed the issue of program-specific funding in other contexts.  In *Grove City v. Bell*, the Court examined the effect of Title IX and held that the language of the statute that prohibited "sex discrimination in 'any education program or activity receiving Federal financial assistance'" created spending conditions only as to the specific program or activity receiving the funding.  465 U.S. 555 (1984).  Congress responded to the ruling in *Grove City* by enacting The Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 (1988), which, in part, amended Title IX to apply institution-wide, rather than to the individual

15

programs or activities as the Court had interpreted.  It is well established that Title VI is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).   Based on the close parallels of Title VI and Title IX, as well as the plain language of the Civil Rights Restoration Act quoted above, Title VI applies to the entire school because of its receipt of federal funds through the NSLP, and thus plaintiffs' claims under Title VI survive summary judgment.

### 2.  Plaintiffs' § 1981 and Title VI Claims of Intentional Discrimination

Plaintiffs allege that they were subjected to intentional discrimination in violation of Title VI and § 1981.  Title VI provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI.  42 U.S.C. § 2000(d).  "[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages." *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001).  Title VI prohibits only intentional discrimination. *Id.*

In the absence of direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis governs § 1981 and Title VI claims.[1]  *See Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582 (1983); *Vesom v. Atchison Hosp. Ass'n*, No. 06-3353, 2008 WL

---

[1]Plaintiffs argue that it is "debatable" whether the record contains direct evidence of discrimination, although it is not clear what evidence plaintiffs contend is "direct" evidence.  A "plaintiff proves discrimination by direct evidence by establishing proof of 'an existing policy which itself constitutes discrimination.' " *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000) (citations omitted), cert. denied, 531 U.S. 876 (2000).  Although plaintiffs claim the record may contain direct evidence of discrimination, they fail to even attempt to prove it.  As such, the court will continue with the *McDonnell Douglas* burden-shifting analysis.

2053069 (10th Cir. May 15, 2008) (analyzing Title VI and § 1981 claims without direct evidence of discrimination under *McDonnell Douglas*).  Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case.  If the plaintiff can establish a prima facie case, then the burden shifts to the defendants to produce a legitimate non-discriminatory reason for their actions.  If the defendants meet that burden, then the plaintiff must demonstrate that the defendants' proffered reason is merely pretextual, meaning that it is "unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

To establish a prima facie case of discrimination under Title VI, plaintiffs must show that: (1) they are members of a protected class; (2) they suffered adverse action; and (3) they were treated less favorably than similarly situated students.  *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 483-84 (10th Cir. 2006) (Title VII); *Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998)(§ 1981).  As it is undisputed that plaintiffs are Hispanics and thus members of a protected class, the court must consider whether the record presents a genuine issue of material fact as to whether the plaintiffs suffered adverse action, and whether they were treated differently from similarly situated students.

To establish a prima facie case of discrimination under § 1981 in a non-employment context, the plaintiff must show: (1) that the plaintiff was a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981.  *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1102; *Vesom v. Atchison Hosp. Ass'n*, No. 04-2218, 2006 WL 2714265, at *15 (D. Kan. Sept. 22, 2006).

### A.  Adverse Action

Defendants claim that plaintiffs did not suffer adverse action because: (1) there is no right to speak a foreign language at a private Catholic school; (2) plaintiffs speak English as their first language.

In support of the assertion that plaintiffs do not have a right to speak a foreign language at school, defendants cite *Rubio v. Turner Unified Sch. District No. 2002*, in which the court stated that it was "not aware" of "any case (Supreme Court, Tenth Circuit, or otherwise) which establishes a right to speak a foreign language at a public school."  453 F. Supp. 2d 1295, 1305 (D. Kan. 2006).  The fact that St. Anne's is a private school and thus is accorded wide latitude in making its own rules and codes of conduct, provides defendants with a good argument that if the right does not exist in a public school, then it certainly should not exist in a private school. When the *Rubio* court made that observation, however, it was in the context of analyzing a 12(b)(6) motion regarding a § 1983 claim against two individuals in their personal capacities. Defendants fail to note, however, that when *Rubio* analyzed the Title VI claim against the district, it noted that plaintiff's allegations that the enactment of an English-only practice at a school was sufficient to allege intentional discrimination under Title VI for purposes of a 12(b)(6) motion.  As such, defendants' assertion that there is no right to speak a foreign language in a private school is not entirely accurate.  To be clear, this court is not suggesting, let alone establishing, a right to speak a foreign language in a private school; rather, it is simply noting that an allegation that an English-only practice at a school is enough to prove that defendants acted intentionally under Title VI.  The fact that the act was intentional, however, does not in and of itself prove a prima facie case.

18

Defendants also argue that plaintiffs did not suffer adverse action, and thus cannot establish a prima facie case, because each, by his or her own admission, speaks English as a first language.  Further, relying on several employment law cases, defendants argue that English-only policies in the workplace have repeatedly withstood constitutional challenge, even when the employees being forced to speak English are non-native speakers.  *See, e.g., Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (holding that a hospital's English-only rule which prohibited cleaning staff from speaking Spanish while working in the operating room did not create a hostile work environment).

Because most of the cases dealing with English-only policies are employment law cases brought under Title VII, it is useful to review the law.  In some circumstances, English-only instructions have been found to create a hostile atmosphere for Hispanics in the workplace, thus violating Title VII.  *Maldonado v. City of Altus*, 433 F.3d 1294, 1304 (10th Cir. 2006), *abrogated in part on other grounds, Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  The EEOC has distinguished blanket English-only policies in the workplace and other policies that are more narrowly tailored.[2]  *See* 29 C.F.R. § 1606.7.  Generally, broad-sweeping English-only policies in the work place are subject to a rebuttabul presumption of violating Title VII.  *See id.* § 1606.7(a).  On the other hand, no presumption exists when employers institute tailored policies that are applicable only at certain times, because such rules are often linked to legitimate business concerns.  *Id.* § 1606.7(b).  For example, for obvious safety concerns, employers can mandate an

---

[2]Although the EEOC's guidelines are not controlling, they are nonetheless "entitled to respect, not as interpretations of the governing law, but as an indication of what a reasonable, informed person may think about the impact of an English-only work rule on minority employees, even if we might not draw the same inference."  *Maldonado*, 433 F.3d at 1306.

English-only policy applicable to pilots who must communicate among themselves and the tower.

Plaintiffs seize on these points, and argue that the blanket English-only policy instituted by the defendants is sufficient to survive summary judgment.  Nonetheless, plaintiffs fail to directly address the elements of a prima facie case or make any effort to show pretext.  Plaintiffs primarily rely upon *Maldonado*, which held that an English-only policy that applied at all times to all employees regardless of occupation or activity, may have created a hostile work environment.

*Maldonado* is distinguishable from the case at hand.  The plaintiffs in *Maldonado* pursued a claim under Title VII, not Title VI or 1981 as the plaintiffs do here.  Additionally, Spanish was the preferred language of at least some of the plaintiffs in *Maldonado*, whereas English is the first language of the student plaintiffs subject to the English-only rule.  *Maldonado* does address bilingual speakers and noted that "published authority from other circuit courts suggests that English-only rules as applied to bilingual speakers are generally not discriminatory."  *Maldonado,* 433 F.3d at 1316.  Standing alone, the authority from other circuits is enough to persuade the court that the English-only rule as applied to the bilingual plaintiffs in this case is not enough to constitute an "adverse action" that is necessary to establish a prima facie case.

Additionally, there are obvious differences between children in a private school setting and adults in an employment relationship as was the case in *Maldonado*.  For example, minor children at a private school do not have a right to an unsupervised lunch break, personal phone calls, or unsupervised breaks that employees might have.  As such, a court's discussion of

tailored English-only policies in the work-place are not directly comparable to the school context. After all, courts have long held that school officials must be able to prescribe and control conduct in the schools, so long as it is consistent with fundamental constitutional safeguards.  *See e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969).   Further, "[t]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings."  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986).  As such, even though the defendants in this case instituted a blanket English-only policy which arguably might be struck down in the workplace, students in the school setting are not analogous to employees in the workplace.

The private school's decision to implement an English-only policy is more akin to the almost universal decision by private schools to mandate the use of uniforms.  Just as many private schools require that its students wear uniforms to help contribute to a more structured and disciplined environment, so too can the schools dictate the language to be spoken when done so for the appropriate reason.  Courts have held that parents do not have a fundamental right to control the clothing their children wear to public schools, and thus that right certainly would not exist in a private school setting.  *See, e.g., Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 289 (5th Cir. 2001).  In the same context, parents do not have a right to control the language their children can or cannot speak at the school, and thus the school has the right to dictate both the clothing and the language that is to be used in the school.

Another judge of this court upheld a school's decision to suspend a student for drawing a confederate flag because the school found that it was in violation of its racial harassment policy. *West v. Derby Unified Sch. Dist. No. 260*, 23 F. Supp. 2d 1223, (D. Kan. 1998).  Despite

21

challenges by the student that his First Amendment rights were violated, the court held that the student's suspension did not violate his First Amendment right to free speech, and that the school had the right to punish students for using offensive language.  *Id.* at 1232.  In a similar vein, it would seem that a private school would have even broader power to regulate speech in the form of language.  Thus, while good to promote bilingualism, this court cannot interfere in disciplinary practices of the school, as such action would ultimately affect the successful operation of the school.  Part of the reason parents make the choice to send their children to private school is for the very reason that private schools can be more restrictive and that teachers may impose stricter standards and behavior than in public school.

Because the court finds that the English-only rule as applied to the bilingual students does not constitute an adverse action, plaintiffs fail to meet their burden of establishing a prima facie case, and thus summary judgment is proper on the intentional discrimination claims under both Title VI and § 1981.

### B.  Pretext

Even if plaintiffs could establish a prima facie case, defendants can articulate a legitimate, non-discriminatory reason for their actions.  Defendants contend that St. Anne's required that English be spoken so that students and teachers can understand what was being said, and so that a foreign language could not be used to make fun of or exclude others.  Further, the English-only policy does not forbid the teaching of a foreign language to young students, and instead is only meant to facilitate disciplinary procedures.  Finally, the school also noted that the use of English was good for immersion in the language.  In the context of Title VII cases, courts have held that similar bases constituted legitimate business reasons.  *See, e.g., Tran v. Standard Motor Prods.*,

10 F. Supp. 2d 1199, 1207 (D. Kan. 1998).  As such, the defendants' proffered reason is a legitimate exercise of the Catholic mission of St. Anne's, and is thus a valid, non-discriminatory reason for the English-only policy.

As such, the burden shifts back to plaintiffs to prove that defendants' proffered reason is merely pretext.  "A plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006) (quoting *Green v. New Mexico*, 420 F.3d 1189, 1192-93 (10th Cir. 2005)).  Plaintiffs fail to meet this burden.   Plaintiffs seem to argue that defendants' proffered reasons for the rule are pretextual because the reasons are similar to justifications for an English-only rule in an employment context which were rejected by the court in *Maldonado*.  The inherent differences between this case and *Maldonado* have already been addressed above.  Further, Dalia Fernandez, one of the plaintiffs, admitted that sometimes the group made fun of others in Spanish.  Dalia Fernandez's admission serves as proof that defendants' perceived problems at the school had credence, and that the policy was put in place for valid, non-discriminatory reasons.  Because the plaintiffs provide only conclusory opinions that the defendants' proffered reasons were pretextual, plaintiffs fail to meet their burden, and summary judgment is proper.

### 3.  Hostile Environment Claim

Plaintiffs allege hostile environment claims under Title VI and § 1981.  Title VI generally prohibits discrimination by federally funded programs, and states that no action shall be taken until the department or agency concerned has advised the "appropriate person" of the failure to

comply with the requirement and has determined that compliance cannot be secured by voluntary means.  42 U.S.C. § 2000d-1. Under an identical provision in Title IX, the Supreme Court has held that unless an "appropriate person" has actual knowledge of the alleged discrimination and fails to adequately respond to such discrimination, a damage remedy will not lie.  *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287, 290 (1998) (noting that Title IX was modeled after Title VI which is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs").  As such, courts have held that school districts can be found liable when a principal has actual notice of the conduct and did not take corrective action to end the alleged discrimination.  *See Rubio v. Turner Unified Sch. Dist. No. 202*, 523 F. Supp.2d 1242, 1250 (D. Kan. 2007).

To establish a prima facie case of hostile environment under Title VI, a plaintiff must prove that: (1) he is a member of a protected class; (2) the harassment was based on race, color, or national origin; (3) defendant had actual knowledge of and was deliberately indifferent to the harassment; and (4) the harassment was so severe, pervasive and objectively offensive that it deprived plaintiff of access to the educational benefits or opportunities provided by the school. *Bryant v, Indep. Sch. Dist. No.* I-*38,* 334 F.3d 928, 934 (10th Cir. 2003); *Rubio*, 523 F. Supp.2d at 1251.

It appears plaintiffs' hostile environment claims arise from either: (1) the racial insensitivity displayed by a few students; or (2) the English-only policy in and of itself.

Courts have held that public school administrators who have a duty to provide a non-discriminatory educational environment for their charges can be liable when they are "made

aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing." *Bryant*, 334 F.3d at 934.  The parties agree that St. Anne's responded to the episodes of racial insensitivity (the email and the flag incident) with swift discipline.  While plaintiffs do not feel that the punishment was severe enough, they acknowledge that the school acted promptly.   Further, plaintiffs assert only a few incidents of racial insensitivity from other students, namely that one student sent an inappropriate email, and that another student made an inappropriate remark regarding the American flag.  "[A] few isolated incidents of racial enmity are insufficient to survive summary judgment." *Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998).  As such, there is no cause of action based on the racial insensitivity of a few students.

Regarding the English-only policy, plaintiffs claim that they: (1) were watched more closely than other students; (2) were worried about being expelled for speaking Spanish; (3) were worried that other students would report them for speaking Spanish; and (4) were not able to focus on their academics.   Viewed in isolation, any of these claims arguably could not survive summary judgment; but, when taken together, these claims are enough to create an issue of material fact as to whether a hostile environment existed.   As such, plaintiffs have met their burden to proceed to trial on the hostile environment claim, as it relates to the English-only policy.  To be clear, this does not establish that a hostile environment existed at St. Anne's; rather, it simply means that there is enough to proceed to an evidentiary trial on the merits to determine if such an environment actually existed.

**4.  Retaliation**

Plaintiff Adam Silva claims that defendants retaliated against him by kicking him out of school for refusing to sign an English-only pledge in violation of § 1981 and Title VI.  Although Title VI does not specifically prohibit retaliation, courts generally imply a private cause of action for retaliation based on the general prohibition of intentional discrimination.  *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74, (2005) (Title IX); *Rubio*, 523 F. Supp.2d at 1253.  As such, the defendants can be liable for retaliation by teachers at St. Anne's if Sister Margaret had actual notice of the conduct and did not take corrective action to end the alleged retaliation.

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in protected activity; (2) he suffered adverse action contemporaneous with or subsequent to such activity;  (3) a causal connection exists between the protected activity and the adverse action; and (4) the defendants knew of the retaliation and did not adequately respond.  *Rubio*, 523 F. Supp.2d at 1253.  The third element pertaining to causal connection in a retaliation case may be proved either by direct evidence or the burden shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Id*. at n. 15.

 Defendants claim that summary judgment is proper because, under the deference rule, courts should not review internal disciplinary procedures of parochial schools.  Further, defendants argue that Adam Silva cannot establish a prima facie case because he did not engage in protected activity, and there is no causation between the protected activity and alleged adverse action.  In response, plaintiffs fail to address the elements of Adam Silva's retaliation claim.

### A.  Court Review of Disciplinary Actions by Parochial Schools

Preliminarily, defendants claim that this court should not review Adam Silva's departure from St. Anne's because "[i]t is not within the purview of the courts . . . , under the guise of a tort action, to review a decision to expel a student from a parochial school." *Connor v. Archdiocese of Philadelphia*, 933 A.2d 92, 98 (Pa. Super. Ct. 2007).  Defendants further argue that a court may not review the question of whether a student was appropriately expelled from a school operated solely by a religious organization.

The court recognizes that the Pennsylvania Superior Court has established a deference standard, but the court is unaware of any Tenth Circuit Court which has adopted the rule.  As such, the deference rule is not applicable to the current facts.

### B.  The Prima Facie Case

#### 1.  Protected Activity

Defendants claim that Adam Silva cannot prove a prima facie case because he did not engage in protected activity because there is no right to speak a foreign language at school. Further, defendants' argue that Adam Silva's parents' decision to reject the school rules led to his departure from St. Anne's, and that refusal to comply with a rational rule is not protected activity.  Adam Silva fails to directly respond to defendants' assertions.

For the reasons already discussed above, this court does not find credence in the defendants' assertion that there is no right to speak a foreign language at a private school. Nonetheless, this court does not believe that Adam Silva's refusal to sign a form constitutes protected activity.  Instead, Adam Silva's refusal to sign the form is more akin to a refusal to wear a school uniform.  Just as a private school can prescribe the dress that its students must

wear to the school, so too can it prescribe policies that the students must comply with.  Adam Silva, a middle school student, had the right to refuse to sign the form, but was not immune from the consequences of that refusal.  His refusal was not protected activity that would constitute the basis for a prima facie case.

There are two views to consider regarding the protected activity in question.  Plaintiffs claim that the protected activity Adam Silva engaged in was opposing discrimination, and that this took the form of refusing to sign an English-only policy.  The other perspective is whether the alleged protective activity is the right to speak a foreign language at various times during school hours.  From the court's perspective, the real issue is whether the right to speak a foreign language during school is in fact a protected activity under federal law; in this circumstance, it is not.  These facts involve a private school, with middle school age students and a clear statement in the handbook that the principal has the final word on matters of discipline.  The court's role in this setting is not to determine whether a policy or approach is wise or whether another policy would be preferable, but whether the defendants have acted in a manner which violates rights protected by the Constitution of the United States, federal law, or both.  As such, the right to refuse to sign an English-only form is simply not protected activity in this context, and the claim cannot survive summary judgment.

### C.  Legitimate Non-Discriminatory Reason

Assuming, for the sake of argument, that plaintiffs could establish a prima facie case, the burden would shift to the defendants to articulate a legitimate, non-discriminatory reason for their actions.  Defendants argue that Adam Silva left St. Anne's because his parents refused to comply with the English-only rule, and were disrespectful of authority at St. Anne's.  Further,

28

defendants argue that the Silvas were disrespectful of teachers and Sister Margaret in front of their child, which is a violation of school policy.  As such, defendants argue that Adam's departure from St. Anne's reflected a mutual desire between St. Anne's and the Silvas to part ways.  Because the school handbook notes that a display of disrespect violates school policy, the defendants' assertion that it transferred Adam Silva because of that violation is enough to establish a legitimate non-discriminatory reason.  The court notes, however, that it is somewhat confused by the defendants' assertions because at other times in its' brief, it argued that Adam Silva's parents are the ones who wanted to transfer Adam to another school.  Regardless, the defendants met their burden.

Because defendants could articulate a legitimate, non-discriminatory reason for the decision to transfer Adam Silva, the burden reverts back to the plaintiffs to prove that defendants' proffered reason is merely pretextual, meaning that it is unworthy of belief. Plaintiffs do not attempt, and in fact cannot meet this burden, and thus the claim cannot survive summary judgment,

## CONCLUSION

To summarize, the parents are proper plaintiffs only as next friends, and not in their individual capacities.  The diocese and Sister Margaret in her official capacity are the only proper defendants; the other entities are dismissed.  The hostile environment claim (under both Title VI and 1981) survives the motion; the remaining claims are dismissed.  To be clear, the holding is not a finding that a hostile environment existed.  Rather, it means only that there is sufficient evidence to have a trial on the issue.

29

IT IS ACCORDINGLY ORDERED this 12th day of January, 2009, that defendants'
motion for  summary judgment (Dkt. No. 31) is hereby denied in part and granted in part, as
discussed above.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE